## Attachment B

*Background*: Since approximately 2005, the defendant, Albert Golant, who is also known as Alex Golant ("Golant"), has been involved in the business of purchasing luxury vehicles in the United States and shipping them overseas to foreign buyers. These cars were generally shipped to individual buyers in China, Russia, and Africa. This was a very lucrative business. For example, a BMW X5 Luxury Crossover SUV, which costs $103,000 when purchased in the United States, will cost $330,000 in China. Golant's luxury vehicle sale/export businesses are WI Automotive T.R.U.S.T. Lease, Registration, and Consulting, LLC, which did business under the name Timeless Auto Group ("WI Automotive T.R.U.S.T."), DOT Automotive of WI, LLC ("DOT Automotive"), and Reliable Car Source ("Reliable").

Golant's businesses received funds to purchase vehicles from overseas customers either directly from the buyers or through "vehicle brokers," who act as customer intermediaries in the United States. Typically, Golant purchased the luxury vehicles after he had received the funds for the purchase. Once Golant, or others working on his behalf, purchased the luxury vehicles in the United States, Golant arranged for them to be shipped either directly overseas to the customer or to a vehicle broker, who was generally located on either the east or west coast.

Luxury automobile manufacturers have attempted to curb such activity by establishing guidelines for dealerships to prevent salespersons at the dealerships from engaging in the practice. To circumvent these guidelines, Golant used "straw buyers" to purchase the vehicles. A straw buyer is an individual recruited to purchase luxury

1

vehicles in his or her name and then transfer the title of the vehicle to Golant for export. Typically, Golant provided the straw buyer with a cashier's check to pay for the vehicle outright. After purchasing the vehicle, the straw buyer would sign over the title to Golant or one of his associates and the vehicle would be shipped overseas.

Alternatively, Golant directed the straw buyer to finance the purchase of the vehicle in his or her name. Golant agreed to pay off the vehicle loan within months, after the straw buyer signs over the title for the vehicle to Golant or one of his associates. On some occasions, Golant paid off the loans obtained in the straw buyers' names in their entirety. On at least 50 occasions, Golant did not pay off the loans in the straw buyer's name, ultimately resulting in losses to the financial institutions.

Additionally, on some occasions Golant provided his straw buyers with false and fraudulent financing applications to present to the dealership when purchasing a luxury vehicle. Again, on some occasions, Golant paid off the loan in the straw buyer's name as promised. On other occasions, however, Golant paid off only a part of the loan in the straw buyer's name and then refused to make additional payments on the loan, causing losses to the banks and lenders. Golant's bank records reveal tens of millions of dollars in cashier's checks written to dozens of straw buyers Golant used to purchase luxury vehicles.

Golant engaged in a fraudulent scheme in which he obtained funds from customers, vehicle brokers, lenders, and investors to arrange for the purchase of specific luxury vehicles and diverted those funds to his own personal benefit. Golant obtained funds from third parties by representing that the funds would be used to purchase

2

specific luxury vehicles. The third parties included vehicle brokers, investors, and lenders, including but not limited to Royal Hao, Inc., Powerful Auto Group, Inc., ZHZ Auto Group, Inc., F Street Investments, Westchester Capital, and ED Medical Transport.

Golant used the funds to gamble, to pay off gambling debts, to provide funds to professional gamblers to gamble on his behalf, to pay off prior loans, and to satisfy obligations to other clients. On certain occasions, Golant never purchased the specific luxury vehicle and did not return the funds. On other occasions, Golant purported to sell the same luxury vehicle to multiple clients at the same time. On still other occasions, Golant obtained funds from investors, lenders, and clients for the purchase of luxury vehicles that he knew had already been sold and exported. Golant purported to sell luxury vehicles, which he knew had previously been sold and exported to China, to dealerships in Wisconsin and Illinois. After the vehicle was fraudulently "sold" to the dealership, Golant represented that he had a customer who would buy the vehicle back from the dealership using financing. Golant submitted false and fraudulent financing applications on behalf of his customers to obtain the financing for the vehicles. Through his scheme, Golant fraudulently obtained at least $30 million from at least 40 different victims.

*Wire Fraud Scheme*: Set forth below is an overview of the scheme to defraud Powerful Auto Group (PAG), one of the vehicle brokers that did business with Golant and his businesses. This scheme to defraud PAG and subsequent money laundering was repeated by Golant against numerous vehicle brokers, including ZHZ Auto Group, Inc.,

Royal Zheng, Inc., JC Express Services, Royal Hao, Inc., Luxury Unlimited, LA Soloman, ED Medical Express.

I.M. is the owner and Chief Executive Officer of PAG, a vehicle brokerage company that specializes in exporting luxury vehicles. In December of 2015, I.M. was introduced to Golant, who represented himself to be a vehicle broker. Golant represented that he could assist PAG in outsourcing vehicle orders from nationwide dealers through his company, WI Automotive T.R.U.S.T. Golant assured PAG that if there were any issues with the vehicles or the paperwork, PAG could return the vehicle and receive a full refund. The understanding between PAG and Golant was that once Golant received PAG's order, he would purchase the vehicle from a dealer, obtain a copy of the CARFAX, and send an invoice and a photograph of the vehicle's window sticker to PAG with the corresponding Vehicle Identification Number (VIN). This would show I.M. that Golant had already purchased the vehicle. Once PAG received the vehicle documentation, PAG would wire a deposit to Golant. PAG would pay the balance of the vehicle purchase by way of a wire transfer. Golant was responsible for obtaining the title for each vehicle PAG purchased through Golant and for providing the title to PAG. Once PAG received the title from Golant and the vehicle from the freight forwarder, PAG arranged for the vehicle to be exported to China.

In early 2016, I.M. learned that she was missing several dozen vehicles for which she had ordered and paid. At the same time, F.H., the owner and operator of ZHZ Auto Group, Inc., Royal Hao, Inc., and Royal Zheng, Inc., approached I.M. with concerns that he also was not receiving all of the vehicles he purchased from Golant. I.M. and F.H.

4

discovered that Golant had sold both of them the same vehicle on multiple occasions. The last direct contact I.M. had with Golant was in May 2016. The investigation revealed that between December 2015 and April 2016, PAG purchased approximately 90 vehicles from Golant and his companies at a cost of approximately $9,073,154, and had paid Golant and his companies $7,690,004 for these vehicles. Thirty-four of those vehicles were never delivered, causing PAG a financial loss of approximately $1,661,735.

Based on Golant's representations, on March 31, 2016, PAG wired $311,010 from its account at East West Bank in California to WI Automotive Trust's account at Citibank in Wisconsin, which was controlled by Golant. This wire transfer is the execution charged in *Count Two*. This wire transfer represented full payment for three 2016 Maserati Quattroportes purchased by PAG. To date, PAG has received only one of the three Maserati's. PAG did not receive a refund for the two Maserati's.

After PAG paid Golant for the three Maserati's, Golant sent a text message to I.M. purporting to confirm that Golant had purchased the three Maseratis. Golant attached an image to his message appearing to show a wire transfer of $304,000 for "3 maserati" to the bank account for the dealership. In fact, a review of WI Automotive Trust's bank account revealed that there were only two wire transfers to the dealership in the amount of $51,449.27 on March 1, 2016, and $104,270 on April 1, 2016. Both transfers had wire instructions for "1 maserati."

On April 20, 2016, I.M. asked Golant about the two missing Maserati's. Golant falsely told her two Maseratis were sold by the dealership to someone else and would be replaced by a later shipment. I.M. never received replacement vehicles. Records obtained

5

from Maserati North America, Inc. show that the two Maserati Quatroportes that Golant claimed to have purchased from PAG were actually sold to other buyers. The current whereabouts of these vehicles is unknown.

Notably, on March 31, 2016, at the time PAG wired $311,010 to Golant to purchase the Maseratis, Golant was on a multi-day trip to L'Auberge Casino Resort in Lake Charles, Louisiana. Golant was with T.K., an associated of Golant's who has done a significant amount of gambling on Golant's behalf, and B.S., a professional gambler who received millions of dollars from Golant and his businesses also to gamble on Golant's behalf.

The wire $311,010 wire transfer from PAG increased the balance in WI Automotive Trust's account to $659,419.46. The same day, $590,000 was wired in two separate transactions from WI Automotive Trust's account to L'Auberge casino's Wells Fargo bank account. These funds went into T.K.'s "front money" account at the L'Auberge casino. According to L'Auberge casino security, T.K. withdrew the funds to gamble. T.K. acknowledged knowing that he was using client funds, which were supposed to be used to purchase luxury vehicles, to gamble on Golant's behalf.

To date, case agents have traced at least $30 million of customer funds Golant obtained that went directly to casinos and professional gamblers, and have identified at least $46 million in funds gambled by Golant and his associates. To date, the government has identified at least $17 million in losses from victim clients, investors, lenders, and financial institutions. As part of his plea agreement, Golant agrees to pay restitution to all victim clients, investors, lenders, and financial institutions as part of this agreement.

*Wire Executions:* On October 22, 2015, there were four wire transfers of funds from client vehicle brokers, HRB Trading Limited, JC Express Services, Inc., Royal Hao, Inc., and Royal Zheng, Inc. for $95,650, $102,175, $206,711, and $96,515, respectively, to the WI Automotive Trust's Citibank account in Wisconsin. The wire transfer for $206,711 from Royal Hao, Inc.'s bank account at Bank of America in California to WI Automotive Trust's bank account at Citibank in Wisconsin is the execution charged in *Count One*. Each wire transfer was for the purchase of a specific luxury vehicle or vehicles. Prior to these transfers, the balance in the WI Automotive Trust's account was $59,135.

On the same day, a cashier's check for $250,000 was purchased using the funds from the WI Automotive Trust Citibank account. The next day, the cashier's check was deposited into the Citibank account of Golant's business partner, T.B. The balance in T.B.'s Citibank account before the cashier's check was deposited on October 23, 2015 was $0.00. After T.B.'s Citibank account received two more incoming wires of client funds, a $400,000 cashier's check was purchased and was deposited the same day at the SLS Casino in Las Vegas. Casino records show T.B. gambling these funds. T.B. admitted to taking $400,000 of client funds to gamble on Golant's behalf. The owner of Royal Hao stated that he had no knowledge that the funds he was providing were being used to gamble and stated that each wire represented the purchase of a specific luxury vehicle or vehicles. Royal Hao eventually received the luxury vehicles ordered or substitute vehicles. The owner of ZHZ, Royal Zheng, and Royal Hao; however, stated that their loss to date, from their business dealings with Golant and his companies is at least $2 million.

<u>*Bank Fraud Scheme Background:*</u> Golant's scheme to defraud included a scheme to defraud federal insured financial institutions. As part of this scheme, Golant approached automobile dealerships in Wisconsin and Northern Illinois with a business proposition. Golant, who operated an automobile dealership in Illinois called Reliable Car Source, claimed to have potential buyers for luxury automobiles he owned. According to Golant, the potential buyers needed to finance the purchase and Golant was unable to provide financing. Golant proposed that he would temporarily "sell" the luxury vehicle to the dealership, which would then arrange financing for the "resale" of the vehicle to Golant's customer.

In fact, Golant had previously sold and exported the luxury vehicles in question and there were no potential buyers. In addition, Golant provided the dealerships with false and fraudulent information to obtain financing for the purported "purchase" of the phantom vehicles.

*Russ Darrow Group*

One such dealership was Russ Darrow Group Chrysler dealership in West Bend, Wisconsin. According to Russ Darrow records, Golant and his business "sold" 32 luxury vehicles to Russ Darrow, which in turn "resold" the vehicles to Reliable's customers. As part of these transactions, Russ Darrow assisted the "customers" in obtaining financing for the purchases from federally insured financial institutions. A total of $2.2 million in financing was obtained by Reliable's customers to purchase these vehicles. In fact, Golant had sold and exported a majority of the vehicles in question prior to the "sale" to Russ Darrow. Moreover, many of the applications submitted to obtain

financing for the "resale" of the vehicles by Russ Darrow contained false and fraudulent information.

*Naperville Italian Motorworks*

Another dealership involved in this arrangement was Naperville Italian Motorworks (NIM) car dealership of Naperville, IL. In February of 2017, Golant told NIM that he had some customers to purchase luxury vehicles from him, but he could not get them the financing they needed. Golant asked NIM to purchase Land Rovers and Mercedes Benz SUVs from Reliable and then re-sell those vehicles to Reliable's customers using financing. NIM agreed to conduct the transactions and made a finance reserve on each deal. NIM records reveal that Reliable sold 16 luxury vehicles to NIM and NIM then resold those vehicles to Reliable's customers, who received financing for those vehicles. To purchase these vehicles, Reliable's clients obtained a total of $1.1 million in financing from financial institutions and other lenders. A majority of the vehicles were titled in Illinois to Reliable before they were sold and Golant signed over the titles as the seller. In fact, Golant had previously sold and exported a majority of these vehicles he purported to sell to NIM. Additionally, numerous credit applications submitted for the loans used to purchase these vehicles contained false and fraudulent information.

***Tax Fraud Conspiracy***: In 2013, after Golant had a falling out with his former business partner, Golant approached T.B. and proposed forming luxury vehicle brokerage businesses together. Since 2011, T.B. had acted as a straw buyer and then a recruiter of straw buyers for Golant and his businesses. In May of 2013, at Golant's direction, T.B. formed WI Automotive T.R.US.T. and DOT Automotive.

9

T.B. was listed as the sole owner and president of both businesses. T.B. was responsible for opening the business bank accounts and conducted many of the businesses banking transactions. Nonetheless, Golant controlled the day-to-day operations of WI Automotive T.R.U.S.T. and DOT Automotive and directed T.B. regarding all business decisions.

Both Golant and T.B. had control over multiple business and personal bank accounts that they used to divert corporate receipts, which were supposed to be used to purchase specific luxury vehicles. The business accounts were typically setup by T.B. and then Golant was either added as a signor at a later date or given access to the accounts online. Golant and T.B. diverted funds to gamble and to purchase personal items such as expensive jewelry.

In the spring of 2014, Golant and T.B. retained the services of S.R. and his business, S. Rozenberg & Associates ("Rozenberg"), to provide bookkeeping and tax preparation services for their businesses. According to S.R., both Golant and T.B. were involved in the tax preparation and filing process.

Rozenberg employees prepared general ledgers and corporate tax returns (Forms 1120) for WI Automotive T.R.U.S.T. and DOT Automotive based upon business bank account statements provided by Golant and T.B. Golant and T.B., however, failed to provide Rozenberg with records for all of the bank accounts used by the businesses and, thereby, concealed true income of the businesses.

Rozenberg employees entered the business bank statements into Quicken and then contacted Golant to classify transactions into different expense categories. According to

Rozenberg employees, they relied heavily on Golant's representations regarding the disposition of the withdrawals from the business bank accounts when classifying them for tax purposes.

Many of the withdrawals from the business bank accounts were, in fact, used to fund Golant's and T.B.'s gambling activity at casinos and to make personal purchases, including Golant's purchases of expensive jewelry; however, Golant told Rozenberg employees that those withdrawals were used to purchase vehicles and that the withdrawals should be deducted as expenses on the corporate tax returns.

Golant and T.B. further concealed that they were gambling with corporate funds by laundering the funds through multiple bank accounts. For example, when Golant planned gambling trips, he would conduct transfers, or direct T.B. to conduct transfers, from WI Automotive T.R.U.S.T. or DOT Automotive business bank accounts to bank accounts maintained by third parties. Frequently, the wire transfers of funds for gambling were disguised as payments for luxury vehicles and the memo line of the transfer paperwork would reference a luxury vehicle, e.g., "HSE Range Rover." After receiving the wire transfers, Golant's associates would withdraw the transferred funds from the accounts as directed by Golant, and the funds would be used to gamble.

As a result, the tax returns prepared by Rozenberg for DOT Automotive and Wisconsin Automotive T.R.U.S.T. substantially overstated the expenses of the businesses by including as business expenses millions of dollars of corporate funds that Golant and T.B. diverted to personal use, primarily for gambling activity.

Rozenberg prepared tax returns (Forms 1120) for DOT Automotive for the years 2013 and 2014. However, only the 2014 tax return was submitted to the IRS. According to S.R., on August 31, 2015 he e-mailed a copy of the 2014 return to Golant with instructions for Golant to review the return and, if accurate, to sign it. Golant forwarded the return to T.B. T.B. signed the return, sent it to Golant, who then forwarded it to S.R.

Rozenberg prepared tax returns (Forms 1120) for Wisconsin Automotive T.R.U.S.T. for the years 2013-2015. Only the 2015 return was submitted to the IRS. No tax returns were prepared or filed for either business for 2016.

Based on an analysis of records for bank accounts maintained by Golant, T.B., and their businesses, casino records, and records of third parties associated with Golant and T.B., the IRS determined that Golant and T.B. underreported the income for their businesses by more than $12 million. This resulted in a tax loss to the United States Government of more than $5.4 million. The following is a breakdown of the unreported income and tax due and owing:

|  | 2014 | 2015 | 2016 | 2017 | Total |
| --- | --- | --- | --- | --- | --- |
| Unreported income | $194,527.68 | $214,407.73 | $8,040,711.95 | $4,154,761.55 | $12,604,408.91 |
| Unreported taxes | $48,027.00 | $41,548.00 | $3,337,527.00 | $2,049,279.00 | $5,476,381.00 |