UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

       Plaintiff,

    v.                                    Case No. 18-CR-144

ALBERT GOLANT, aka Alex Golant,

       Defendant.

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Laura S. Kwaterski, Assistant United States Attorney, respectfully submits this memorandum in advance of the defendant's August 5, 2019 sentencing.

Over the course of several years and while he was on federal supervised release for a prior fraud conviction, Golant orchestrated and engaged in a sophisticated Ponzi scheme through which he obtained at least $30 million from at least 40 different victims. Golant obtained the funds from third parties by representing that the funds would be used to purchase specific luxury vehicles. Instead, Golant converted the funds to his own use. He used the funds to support his lavish lifestyle and maintain his wealthy image—including flying across the country in private jets to engage in high-stakes gambling at exclusive, luxury casinos, and living in his luxury 10,000 square foot home that was rented for $7,500 a month. Golant also used the funds to pay off prior gambling debts, to pay professional

gamblers to gamble on his behalf, and to attempt to sustain his luxury vehicle export businesses by using client funds to pay off prior loans, and using one client's funds to satisfy obligations due and owing to his other clients.

In the end, the result of Golant's egregious and aggravated conduct, which was fueled by his desire to lead an extravagant and wealthy lifestyle, left at least 22 victims with a net loss of approximately $17.8 million and the United States with a tax loss of approximately $5.4 million. The purpose of this sentencing memorandum is to highlight aspects of Golant's conduct and history beyond what is included in the lengthy presentence report (PSR), including Golant's lengthy history of defrauding his clients and investors of millions while personally enriching himself, leading an extravagant lifestyle, and feeding his high-stakes gambling habit. For the reasons set forth herein, which will be expounded upon at the sentencing hearing, the United States is respectfully requesting that this Court impose a sentence of imprisonment of 156 months' imprisonment (13 years).

## I.    ARGUMENT

The sentence this Court imposes should be sufficient, though not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, adequately punish the crimes committed, deter other criminal conduct, protect the public from the defendant and provide for any particularized needs of the defendant.    18 U.S.C. § 3553(a)(2).    In determining the appropriate sentence, this Court must consider each of the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007).    In addition to the goals outlined above, these factors include the nature and

circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the Sentencing Guidelines range; the policy statements of the Sentencing Commission pursuant to Title 28, United States Code, Section 994(a)(1); the need to avoid unwarranted disparities among similarly situated defendants; and the need to provide restitution to the victims. 18 U.S.C. § 3553(a).

Put simply, courts should impose sentences that take a holistic view of a defendant's characteristics and conduct, as well as the impact of that conduct on the community. In doing so, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Jones*, 635 F.3d 909, 917 (7th Cir. 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). This principle is echoed in 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also* 18 U.S.C. § 3553(a)(1) (directing consideration of the "history and characteristics of the defendant"). "The facts that a sentencing judge finds in determining what sentence to impose—such facts as the defendant's criminal history, his cooperation or lack thereof in the government's investigation, and his remorse or lack thereof—need be found only by a preponderance of the evidence." *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007).

The United States submits that a sentence of 13 years imprisonment would most appropriately account for the factors set forth in Section 3553(a)—specifically, the nature

and circumstances of the offenses of conviction, promoting respect for the law, providing specific deterrence, and protecting the public from Golant.

### A.     The Nature and Circumstances of the Charged Offenses

Golant's scheme to defraud had a profoundly negative impact on its victims. As the Guidelines calculations reflect, Golant's bank and wire fraud scheme harmed far more than 10 victims (at least 40), resulted in a loss that far exceeded $9.5 million (approximately $17.8 million), and included a loss of over $1 million from financial institutions (at least $3 million). Multiple victims stated that being duped by Golant's elaborate fraudulent scheme may end up costing them their livelihoods and businesses. The victim letters attached to the PSR and victim impact statements that the Court will hear at sentencing will highlight the extreme suffering that Golant caused.

Golant's conduct was aggravated not only because he stole an outrageous amount of money, but because he stole it over a long period of time. This was not one bad decision. Rather, fraudulent and deceptive conduct was Golant's lifestyle—his career choice. He engaged in a course of deceptive conduct that occurred literally day-in and day-out for many years. Golant had to lie in order to trick investors and lenders into investing, and he had to lie and engage in deception to maintain his current clients. Golant manipulated wire transfers to lull unsuspecting clients into believing that he had in fact purchased a specific luxury vehicle as promised, when he knew that that vehicle had already been exported or that he had promised to sell the same vehicle to multiple clients at the same time. Golant knowingly obtained fraudulent titles for vehicles and directed others to manipulate and "flip" titles, by putting false mileage numbers on the titles, forging

4

signatures, and knowingly and fraudulently obtaining titles for cars that he knew had already exported. Golant created numerous false and fraudulent documents that he sent to his victims when they started asking questions about their investments. For example, Golant provided victim Westchester Capital with numerous sets of completely fraudulent documents supposedly reflecting vehicle purchases in order to obtain continued funding from Westchester Capital.

Golant's fraud was also sophisticated. He admitted that he created and maintained various entities as shell companies, including SHAA, LLC and MMP Automotive. All transactions within these companies were directed by Golant and used for the same business purposes as WI Automotive Trust. The shell companies were created for several reasons. First, it was easier for Golant to transfer large amounts to a business entity, rather than an individual, without scrutiny, especially since the funds ultimately went to casinos and the accounts for Golant's other businesses (WI Automotive Trust and DOT Automotive) were routinely shut down due to suspicious activity. Second, Golant admitted that by using the shell companies he was able to prolong these banking relationships (and his fraudulent scheme) by hiding the fact that WI Automotive Trust, DOT Automotive, or Golant himself, were involved in the transactions.

To date, case agents have traced at least $46 million in client funds that were gambled by Golant and his associates. At least $30 million of customer funds Golant obtained went directly to luxury casinos and professional gamblers, sometimes moving from the client/customer's account through various shell accounts to the front-house account at a luxury casino within a matter of hours or one day.

5

Additionally, Golant directed and supervised the fraudulent straw purchase and financing of at least 42 luxury vehicles that he had previously sold to exporters and that he knew had already been exported to China. Golant directed his employees to flip the titles to these vehicles so the titles falsely listed one of Golant's businesses as the owner. Golant directed some straw buyers to sign financing applications, and in multiple instances Golant signed the paperwork himself without the straw buyer's knowledge. Golant was the primary individual who dealt with the dealerships regarding these transactions; he directed his runners to pick up and deliver paperwork and payments at the dealerships and deposit the fraud proceeds into accounts that Golant controlled. This portion of the scheme alone resulted in over $3.3 million in fraudulently obtained loans from financial institutions.

The only thing that is more aggravated than the overall scope and egregiousness of Golant's conduct in this case is that he engaged in the current fraudulent scheme *while he was on federal supervised release for a prior fraud conviction*. Indeed, as set forth in the PSR, Golant was arrested in 2012 and sentenced in 2016 to 9 days jail (time served) and three years' supervised release for engaging in the same fraudulent conduct, albeit on a much smaller scale—in his prior case, Golant *only* defrauded 13 victims out of approximately $2.9 million.

This Court should not be another victim of Golant's empty promises to "pay back restitution and maintain a gambling free lifestyle." PSR at ¶ 61. The total amount Golant paid toward his restitution in his prior case, while he was living in a 10,000 square foot home and reportedly earning $8,000 a month, was $14,000.00; there is a remaining balance

6

of $2,991,590.69. Golant also engaged in Gamblers Anonymous programing during his prior term of supervised release; however, he was not consistent in his attendance and he lied to his supervising probation officer about engaging in gambling activity, traveling out of state to gamble, and hiring others to gamble on his behalf.

Golant benefitted from the scheme by personally enriching himself by at least $3.4 million. He had a lavish lifestyle, drove expensive luxury vehicles, including a Bentley, Range Rover, and a Mercedes G63; gambled in high-stakes $500,000 poker games; and stayed for free in luxury suites at casinos across the country, including, among others, the Mohegan Sun in Connecticut, the Wynn and the Venetian in Las Vegas, and the L'Auberge in Louisiana. His lavish spending gave the impression to clients, customers, and investors that he was successful. Golant also spent lavishly because he enjoyed living extravagantly. It was not the gambling he was addicted to. It was the lifestyle.

### B.    History and Characteristics of the Defendant

As set forth above, Golant has three criminal history points, and a criminal history category of two. PSR at ¶ 90. That score understates the reality of his prior conduct. He has a lengthy history of engaging in fraudulent conduct, since at least 2011, and he has prior arrests for larceny, theft, and theft/deception. This history of deception and fraud shows that the instant offense was not completely out of character, and suggests that the criminal history score underrepresents "the likelihood that the defendant will commit other crimes ..." U.S.S.G. §§ 4A1.3(a)(1), (2)(C) (referencing "[p]rior similar misconduct"). Further, Golant has a supportive family and benefited from a good childhood and education, and he has no mental health issues. On the one hand, these factors suggest that

Golant will have support once he leaves prison, but these factors also reveal how aggravated and unnecessary his fraudulent conduct was—he should have known better (and he did know better given his prior fraud conviction), and he certainly had other options in life than to engage in a years-long fraud and steal at least $17.8 million from his victims.

The only factor in mitigation is that Golant accepted responsibility and promptly pleaded guilty and did not go to trial, enabling his victims to avoid being put through another traumatic ordeal.

### C. Other 18 U.S.C. § 3553(a) Factors

Title 18 U.S.C. § 3553(a) provides that a court should consider the need for the sentence imposed "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and to "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." Here, all of these factors favor a sentence of 13 years. First, for the reasons articulated in Section A, *supra*, this offense is severe enough that the Court should punish Golant for his conduct and the effect that his conduct had on his multiple victims. Second, the crime Golant committed— a Ponzi scheme—is not a crime of passion or opportunity that is committed in a single instant of a bad decision. Instead, it is a deliberative crime, committed over the course of years—exactly the type of crime that can and should be deterred by an adequate and substantial prison sentence.

The defendant's request for 50-month sentence, which is 101 months below the bottom end of the guidelines, would result in an absurd and unwarranted disparity with other defendants sentenced in this District, as the following table demonstrates:

**Selected Sentences in White Collar Cases in E.D. Wisconsin**

| Case No. | Defendant | Judge | Sentence | Appox. Loss |
|---|---|---|---|---|
| 02-CR-206 | K. Hackbarth | Randa | 120 months[1] | $6,000,000 |
| 03-CR-170 | Leslie Hamilton | Stadtmueller | 300 months | $14,256,346 |
| 05-CR-013 | Robert Brownell | Clevert | 240 months | $6,738,477 |
| 07-CR-245 | Martin Valdez | Adelman | 72 months | $1,227,591 |
| 07-CR-113 | James Lytte | Stadtmueller | 84 months | $1,794,438 |
| 08-CR-208 | Dale Endries | Griesbach | 71 months | $2,610,443 |
| 08-CR-325 | M. Morris | Clevert | 97 months[2] | $20,000,000 |
| 07-CR-204 | Michael Lock | Stadtmueller | 160 months | $1,458,823 |
| 10-CR-006 | Sue Sachdeva | Adelman | 99 months[3] | $34,000,000 |
| 10-CR-176 | Mervyn Rutley | Adelman | 72 months | $205,247 |
| 13-CR-219 | Lisa Lewis | Griesbach | 180 months | $2,021,486 |
| 13-CR-135 | Mark Parks | Griesbach | 108 months | $1,500,000 |
| 14-CR-196 | D. Jones | Clevert | 70 months[7] | $705,000 |
| 14-CR-196 | C. Mitchell | Clevert | 72 months | $550,000 |
| 15-CR-115 | Todd Dyer | Stadtmueller | 180 months | $1,800,000 |
| 15-CR-214 | Gregory Kuczora | Griesbach | 70 months | $1,000,000 |
| 16-CR-100 | Todd Dyer | Pepper | 110 months | $937,000 |
| 17-CR-160 | Ronald Van Den Heuvel | Griesbach | 90 months | $9,500,000 |
| 18-CR-116 | James Nickels | Griesbach | 84 months[4] | $3,100,000 |

Simply put, a sentence lower than 13 years in this case would create unfair and unwarranted disparities with comparable defendants.

---

[1] Defendant was 77 years old at the time of sentencing.

[2] Defendant was 71 years old and in poor health at the time of sentencing.

[3] This sentence was reduced for substantial assistance to the government in other cases.

[4] Defendant was 68 years old at the time of sentencing.

## II. CONCLUSION

For all of the above reasons, this Court should sentence Golant to 13 years' imprisonment.

Respectfully submitted this <u>2nd</u> day of August, 2019 at Milwaukee, Wisconsin.

          Respectfully submitted,

          MATTHEW D. KRUEGER
          United States Attorney

     By: *s/ Laura S. Kwaterski*
         Laura S. Kwaterski (WBN 1055485)
         Assistant United States Attorneys
         Office of the United States Attorney
         Eastern District of Wisconsin
         517 East Wisconsin Avenue, Room 530
         Milwaukee, Wisconsin 53202